IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RAHSAAN DARDEN,                          }
                                         }
        Plaintiff,                       }
                                         }
v.                                       }          CASE NO. CV 98-B-2438-S
                                         }
UNITED PARCEL SERVICE,                   }
                                         }
        Defendant.                       }

**ENTERED**
~T – 2 2000

U.S. DISTRICT COURT
N.D. OF ALABAMA

SEP 29 ... 5:50

## MEMORANDUM OPINION

Defendant, United Parcel Service, ("UPS"), seeks summary judgment on all claims in this race discrimination action brought by plaintiff Rahsaan Darden, who claims UPS violated Title VII, 42 U.S.C. 2000e, *et seq.*, and 42 U.S.C. § 1981 with regard to "discipline and termination." (*See* Compl. at ¶10.) Upon consideration of the record, the submissions of both parties, the argument of counsel, and the relevant law, the court is of the opinion that defendant's motion is due to be granted.[1]

_____

[1] At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendant. The court requested that counsel for defendant prepare a proposed memorandum opinion for the court and required that counsel send a copy of the proposed opinion to counsel for plaintiff. Although the court has made some changes to the opinion prepared by defendant's counsel, it has adopted a large part of the proposed opinion. The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n. 46 (11th Cir. 1997). This is an important opinion and the court had reached a firm decision as to the appropriate outcome before requesting a proposed opinion from defendant's counsel. In this case, however, the defendant drafted the opinion according to the express instructions of the court as to its contents. These instructions were stated to defendant's counsel, with plaintiff's counsel present, following oral argument. For example, in defendant's Brief in Support of Its Motion for Summary Judgment, defendant argued that plaintiff had failed to establish a prima facie case of discrimination because, although plaintiff's replacement was Caucasian, UPS was required to fill bargaining unit positions based on seniority. *See* Def's Br. in Supp. of Mot. for Summ. J. at p. 21, n.13. At oral argument the court informed counsel that it disagreed with this argument of counsel and instructed defendant's counsel that when drafting the proposed opinion, it should find that plaintiff established a prima facie case of race discrimination. The proposed opinion followed the court's instructions in this regard. Although largely taken from the opinion proposed by defendant's counsel, the court

## I. FACTUAL BACKGROUND

### A.   UPS WORKPLACE VIOLENCE PREVENTION POLICIES.

UPS is committed to maintaining a safe working environment for its employees. (Brawley Aff. at ¶ 3; Boone Dep., pp. 71-72.)  To that end, UPS maintains a zero tolerance for workplace violence.  (*See* attached Appendix A; Boone Dep. at Ex. 5.)  Specifically, Article 51, of the UPS collective bargaining agreement ("CBA") with the International Brotherhood of Teamsters ("IBT"), allows UPS to terminate any bargaining unit employee for "engaging in unprovoked physical violence on Company property or while on duty."  (Attached Appendix B; Boone Dep. at Ex. 6.)  UPS also has a "Workplace Violence Prevention Policy" which applies to all its employees.  (*Id.*)  This policy appears on a "permanent posting" throughout the Birmingham facility.  (Boone Aff. at ¶ 3.)  Rahsaan Darden ("plaintiff" or "Darden") acknowledges that he saw the UPS workplace violence prevention policy while he worked for UPS. (Darden Dep., p. 38.)  This policy specifically prohibits employees from making "threatening comments" or engaging in "intimidation."  (Appendix B.)  The policy defines a threat as "[a]ny comments or behavior that reasonably could be interpreted as an intent to do harm to employees . . . ."  (*Id.*)  Finally, the policy indicates that UPS will treat any reports of alleged violence as "important and appropriate action, including an investigation, will be taken." (*Id.*)[2]

---

personally reviewed this opinion and the opinion reflects the court's own conclusions.

[2]Consequently, UPS investigates <u>all</u> reports of potential workplace violence, whether received from the alleged victim or a third party. (Boone Dep., pp. 71, 91; Brawley Dep., pp. 31-32, 60; Turner Dep., p. 17.)

## B.   DARDEN'S TENURE AND THE INCIDENT INVOLVING CO-WORKER TARA COOPER-HUNTER.

Darden, who is African American, was employed by UPS from September 1995 through July 14, 1997, when UPS terminated Darden for violating its policies against workplace violence. (Boone Dep. at Ex. 4; Boone Aff. at ¶ 2; Darden Dep., pp. 41-42.)  During Darden's tenure with UPS, he worked as a part-time clerk who was responsible for "high value" packages. (Boone Dep., pp. 32-33, 26.)

In July 1996, Darden had an encounter with a UPS co-worker, Tara Cooper-Hunter, which resulted in a verbal warning.  Cooper-Hunter, who is also African-American, (Boone Dep., p. 37), reported that Darden had stood close to her and touched her on the shoulders and head. (Boone Dep., pp 50-53.)  Cooper-Hunter also stated that she found such conduct offensive, uncomfortable and threatening. (Boone Dep., pp. 51-53.)  Consequently Michael Boone ("Boone") (Caucasian), the Center Manager, instructed a UPS supervisor to speak with Darden, read him the sexual harassment policy and explain that UPS would not tolerate such behavior. (Boone Dep., pp. 51, 53, 17-20.)  Boone further instructed the supervisor to inform Darden that he should refrain from touching other employees. (Boone Dep., p. 53; Brawley Dep. p. 51.)  Darden admitted that he touched Cooper-Hunter on the head, but claimed the touch was innocent. (Darden Dep., pp. 366-67.)  In any event, the supervisor memorialized his conversation with Darden by making the following notation in Darden's personnel file:

> T/W Shawn concerning complaint from UPS employee, explained
> how certain acts may be perceived as sexual harassment, <u>instructed
> Shawn not to touch other employees</u>.  Shawn stated that he
> touched her on the head and <u>agree to discontinue any form of
> touching</u>.

3

(Darden Dep., at Ex. 32, p. D0060) (emphasis supplied.)  Darden initialed this entry in his

personnel record acknowledging the substance of the conversation.  (*See id.*; Darden Dep., pp.

368, 244-45, 252.)

## C.  THE 1997 INCIDENTS INVOLVING CO-WORKERS SHANNON MELTON AND OTHERS.

In July 1997, almost a year after the Cooper-Hunter incident, UPS employee Dion Jones

(African American), (Darden Dep., p. 140), witnessed an incident between Darden and African

American employee Shannon Melton, (Melton Dep., pp. 6-7, 23-24, 29; Boone Dep., p. 73;

Turner Dep., pp. 14-15; Melton Dep. at Ex. 1.)  Jones reported the incident to Supervisor

Richard Jemison (African American), who in turn reported this information to Frank Woodson

(African American), his boss.  (Turner Dep., pp. 13-14; Boone Dep., pp. 56-57; Darden Dep., p.

44.)  Because Boone was out of town when Jones reported the incident, Woodson was in charge

of the Center's package operations.  (Boone Dep., p. 57; Turner Dep., pp. 13-14.)  Jemison and

Woodson relayed the report about Darden to David Turner ("Turner") (Caucasian), the

Operations Division Manager.  (Turner Dep., pp. 11-14; Darden Dep., p. 45.)  After receiving

the report, Turner consulted with Emery Brawley ("Brawley"), the Labor Relations Manager.[3]

(Turner, p. 16; Brawley Dep., pp. 8-9, 12-13.)  Brawley and Turner decided to take Darden "out

of service," (*i.e.*, send Darden home early) pending investigation of the allegation.  (Turner pp.

16-17; Brawley Dep., pp. 33-34.)

Accordingly, Jemison told Darden to "clock out" and supervisor, Steven Young

(Caucasian), (Darden Dep., p. 22), escorted Darden off the premises.  (Darden Dep, pp. 303-4,

82-83, 254-55, 206-7; Darden Dep. at Ex. 19, ¶ 7.)  While waiting for his mother to pick him up,

---

[3]Brawley's responsibilities include defending the company during grievance hearings, determining the appropriate discipline for union employees who violate work rules, and working with management to investigate alleged violations of the CBA.  (Brawley Aff. at ¶ 2.)

Darden requested a union steward. Turner explained that UPS had not formally disposed of the matter by exonerating, disciplining or terminating Darden and, therefore, Darden was not entitled to a union steward at that juncture. (*See* Turner Dep., p. 22-23.) Turner further explained that Darden would be entitled to union representation if UPS decided to impose discipline. (Turner Dep., p. 22-23.)

On the same day that UPS took Darden out of service, Guy Sciro (Caucasian) began the UPS investigation. (*See* Turner Dep., pp. 18-20, 31; Boone Aff. at ¶ 4.) An African American male supervisor then approached Melton and asked her to come to an office. (*See* Melton Dep., pp. 16-17.) The supervisor left Melton in the office with two Caucasian males and an African American female.[4] (Melton Dep., p. 17-18.) All three introduced themselves to Melton and one of the men left the room. (Melton Dep., p.20.) Melton testified that the remaining Caucasian male and the African American female asked Melton if she had been harassed.[5] (Melton Dep., pp. 19-21.) The two investigators indicated that Melton should show them how she had been touched and the male investigator offered to leave the room so that Melton could talk to the female investigator privately. (*Id.*) After Melton showed the two that Darden had nudged her, the two investigators asked her again to show them how she had been touched. (*Id.*) Melton testified that the two interacted with her in a manner which suggested that she could "let it out, [because everything was] all right." (*Id.*) Melton responded to the queries by indicating that she had not been sexually harassed. (Melton Dep., p. 21.) At some point that evening, Brawley interviewed Melton and noted in his file that Melton had not been sexually harassed:

---

[4]Presumably the two Caucasian males were Brawley and Sciro because Turner, the only other Caucasian manager involved at this juncture, did not participate in the investigation. (*See* Turner Dep., p. 23.)

[5]Sciro was the male who remained and questioned Melton. (*See* Sciro Aff. at ¶¶ 3-5.)

I asked Shannon Melton if R. Darden touched her in any way that
could be viewed as sexual in nature and she said no.  She also said
that she wasn't harassed.

ss Emery J. Brawley  7-9-97

(Brawley Dep. at Ex. 2; Brawley Dep., pp. 35-38.)

That same evening, Sciro interviewed other witnesses, some of whom claimed to be

victims as well.  (Sciro Aff at ¶¶ 4-5; *see* Melton Dep., pp. 23, 35-36.)  After completing the

interviews, Sciro asked the witnesses to prepare written statements.  (Sciro Aff. at ¶¶ 4-5.)  UPS

escorted these individuals into "separate little offices . . . so everyone was separated and no one

was talking to each other.  So everybody filled out their own individual statement . . .," including

Melton.  (Melton Dep., pp. 23-24.)  Neither Melton nor any of the witnesses indicated that they

were reluctant to prepare a statement.  (Melton Dep., p. 24; Sciro Aff. at ¶ 5.)

The witness who experienced the least serious incident described Darden's numerous

requests that she call him, even after she repeatedly refused to do so.  (Boone Dep. at Ex. 3, pp.

3-5, statement of Sandra Sheppard.)  Darden later came by the woman's office, threw open the

door and walked away.  (*Id.*)  Other employees described other incidents and/or corroborated the

following statement by Melton:

7/9/97
To: Guy J. Sciro
From: Shannon L. Melton
Subject: Alleged Harassment

On Wednesday July 2, 1997 while standing near the 400 belt, a
young man by the name of Shun or Dardin walked by me and
nudge me in my back on two occasions.  I did not know this
young man due to the fact that I had only been at UPS for 5 days.
On the days leading up to July 8, 1997, this young man held
several conversations with me while standing in my work area for
very lengthy periods of time.  He continuously tried to get my
telephone number regardless of my consistent no's.  He often
would stand very close, which resulted in him invading my
personal space.  On July 8, 1997, this young man walked up and

6

shoved me from behind, and I politely bumped him off of me. <u>I told him that this was the last time touching me because he had no right. He jokingly stated that he did not believe me, and he figured that he had at least 2 or 3 more times to push on me if he chose to.</u> Both times that this young man pushed and/or touched me, there was another individual that witnessed (Deon) the event. Upon leaving last night, he [Darden] was standing on the top of the steps waiting on his ride. <u>He jokingly made the comment that I did not have my scale in my hand to protect myself and he called me a "fuck nigger." This made me uncomfortable due to the fact that I know nothing about this young man, nor what he is capable of doing. Also, it was very uncomfortable knowing that whenever he came around that there was a possibility of being touched.</u> His actions have resulted in me writing a statement on his improper and rude behavior.

ss Shannon L. Melton
7/9/97

(Melton Dep. at Ex. 1; *see* Melton Dep., pp. 24-26) (emphasis supplied).

To: Guy
From: Eric Howard
Concerning - ReShawn Darden

On July 3 I Eric Howard saw the above kick Shannon [6] on the heel of her feet twice.

On July 8 I Eric saw the above brush up against Shannon with all his weight until she leaned.

ss Eric Howard  7-9-97

(Boone Dep. at Ex. 3, p. 1)

7-8-97
To: Guy Sciro
From: Dion

I saw Rashawn Dardin talking to Shannon for a while on 7-8-97, then later on he returned and he pushed her.

ss Dion Jones
7-9-97

_____

[6]As discussed below, Melton later informed UPS that Darden had kicked her. (*See* Melton Dep. at Ex. 2.)

(Boone Dep. at Ex. 3, p. 2)

> Date: 07-09-97
> To: Guy Sciro
> From: Sandra Jones
> Subject: Shawn Dardon
>
> On June 30, 1997 Shawn Dardon approached me and asked me out. After refusing him he insisted on me taking his number. After he left I threw the number away. He some how found it and came around and threw the paper and hit me with it.
>
> On July the 8th as I was leaving to go home Shawn threw a whole cup of ice at me. The cup missed me maybe by a ½ in. When I looked back he threw his hand up and laughed.
>
> On July 8th he kicked Shonna in the back of her legs twice. The first time she told him to stop and he kicked her again, also every time I looked over where Shonna works at he was standing around her, even after she said to him to leave her alone.
>
> ss Sandra Jones
> 7/9/97

(Boone Dep. at Ex. 3, p. 6.)

> 7-9-97
> To: Guy Sciro
> From: Jamel Beard
> Sub: Shawn Darden
>
> On June 30, 1997 Shawn Darden came back to the Air Trailer. He was trying to talk to Sandy. He stayed back there for some time and he gave her his phone number. When he left she threw away his phone number. Then he came back there and found it. He found her and when he did he threw the phone number at her and hit her with it. I don't know if he called her any names or not.
>
> Jamel Beard
> 7-9-97

(Boone Dep. at Ex. 3, p. 7)

After reviewing the witness statements, Brawley discussed the matter with Boone, who had returned from vacation. (Brawley Dep., pp. 45-46; Boone Dep., p. 64; *see* Melton Dep., p. 37.) During this conversation, Brawley stated that he had some open issues about the encounters

8

between Melton and Darden. (Brawley Dep., pp. 41-43; Boone Dep., 64-69.) Boone recalls that

Brawley wanted more details about the encounters because he had questions regarding whether

Melton had touched Darden. (Boone Dep., pp. 95-96.) Consequently, Brawley requested that

Boone talk to Melton and ask her additional questions.[7] (Brawley Dep., pp. 41-42; Boone Dep.,

pp. 95-96.) In fairness to all involved parties, Boone questioned Melton to ensure that UPS was

doing the "right thing" before a decision was made regarding how to handle the matter. (Boone

Dep., pp. 94-97.)

During Boone's meeting with Melton, he explained that he needed more details regarding

what had transpired between her and Darden. (Boone Dep., pp. 66-67, 96.) Melton recalls that

Boone read aloud the witness statement she had prepared a few days earlier and asked her if she

had been sexually harassed, to which Melton responded no. (Melton Dep., pp. 37.) After

questioning Melton, Boone asked Melton to prepare another statement and handed Melton the

first written statement. (Melton Dep., pp. 24, 37, 39; Boone Dep., p. 69.) Boone then left the

room, during which time Melton prepared a second statement:

> 7/9/97[8]
> To: Guy J. Sciro
> From: Shannon L. Melton
> Subject: Alleged Harassment
>
> On Wednesday July 2nd, 1997 while standing at the 400 belt, a
> young man by the name of Rashun Dardin walked behind me and
> pushed me in my back. The push was not a very hard push, yet it

---

[7]Brawley does not recall why he wanted additional information. (Brawley Dep., p. 43.)
However, Brawley handles all grievances (not just terminations) for the entire state of Alabama and
the Florida panhandle. (Brawley Dep., pp. 8-9, 12-13.) Therefore, it is not unusual that he would
not remember such a detail. Boone, on the other hand, oversees solely the Birmingham facility,
(Boone Dep., pp. 19-20), and he was directly involved in obtaining a second statement from Melton,
as well as terminating Darden.

[8]It is not clear why the second statement, which Melton prepared several days after the first,
contains the same date as the first statement. However, there is no evidence that UPS or Boone
influenced Melton to use the same date. (*See* Boone Dep., pp. 68-69.)

9

surprised me. After pushing me he smiled as if his push was his way of saying hello. I did not know this young man due to the fact that I had only been at UPS for 5 days. On the days leading up to July 8, 1997, Rashun held several lengthy conversations with me at my work area on the 200 belt. The time frames could range from 10 minutes to 45 minutes at certain times. He continuously asked me for my telephone number which he never received. I clearly explained to him that I had a boyfriend, which he said he cared nothing about. Rashun would often times stand very close to me while trying to ask me for my telephone number, which resulted in him invading my personal space. On July 8, 1997, Rashun walked up behind me while standing at the 200 belt and <u>shoved me from behind. This shove resulted in me jerking forward and dropping the clipboard which I had in my hand onto the belt</u>. Right after pushing me, he walked up on me which <u>resulted in me somewhat leaning on him. This prompted me to bump him off me so that I could have room to move. Until this point I had never physically touched him nor gave him the idea that I wanted him</u> to touch me or try to flirt with me. His actions resulted in me telling him that this incident was the last time that he was going to touch me. <u>He jokingly disagreed by saying that he felt that he had two or three more times to touch me, and that he knew that I would not do anything back to him</u>. I politely told him to step away from me because I had picked up my scale in case he tried to touch me again. He again laughed at my actions. On both occasions that Rashun touched me, there were others that witnessed the act, Deon and Eric. Upon leaving the night of July 8th, I saw Rashun standing **[outdoors]** at the top of the steps waiting on his ride. <u>He jokingly made the comment that I did not have my scale to protect myself now, and in the process of taunting me he called me a</u> **"fuck nigger."** <u>He laughed at his statement which insulted and scared me because I did not know what he was capable of doing. There was no flirting or trying to come on to him on my part which could have resulted in this event taking place.</u> I found it very uncomfortable that Rashun felt that he could touch on me as he pleased. <u>His actions angered me which resulted in me writing this statement.</u>

ss Shannon L. Melton<br>7/9/97

(Melton Dep. at Ex. 2; Melton Dep., pp. 34-36) (emphasis supplied).

After considering Melton's statements, the statements of the other employees, and the previous incident involving Cooper-Hunter, Brawley decided to terminate Darden. (Brawley

10

Dep., pp. 45-47, 51, 81-82; Brawley Dep. at Ex. 4.)  On July 14, 1997, UPS held a meeting with

Darden and his union representative, during which UPS terminated Darden.  (Darden Dep., pp.

211-13; *see* Brawley Dep. at Ex. 4.)  Later that day, Darden filed a grievance over his

termination and the company's failure to provide him with a union steward when it took him out

of service.  (Darden Dep. at Ex. 22.)  Darden eventually filed twelve additional grievances.

(Darden Dep. at Exs. 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14.)  In one of those grievance reports,

Darden admitted pushing Melton, but claims he was merely engaged in "horseplay."  (*Id.* at Ex.

13.)[9]

## C.    MELTON'S THIRD WITNESS STATEMENT.

An employee who files a grievance may have the matter resolved at a "local level"

hearing involving Boone, Brawley, a union Representative and the employee.  (*See* Boone Dep.,

p. 87.)  If the matter is not resolved at the local hearing, the grievance is heard by a panel which

consists of three management representatives and three union representatives.  (Brawley Dep.,

pp. 56-57.)  Individuals from three state regions comprise the pool of three union representatives

who appear on the panel.  (*Id.* at p. 56.)  Brawley represents the company at all grievance

hearings involving UPS employees in Alabama and the panhandle of Florida.  (Brawley Aff. at ¶

2; Brawley Dep., p. 57, 12-13.)  A union representative from the grievant's local presents the

employee's case to the panel, (Brawley Dep., p. 57), before whom the employee may also

testify.  (Brawley Aff. at ¶ 4.)  After all the presentations are completed the panel members ask

questions and later sequester themselves for deliberations.  (Brawley Dep., p. 57.)  If a majority

of the committee cannot reach a decision, the case proceeds to the "deadlock panel," which

---

[9]Pursuant to the National Labor Relations Act ("NLRA"), Darden also filed unfair labor practice charges, with the National Labor Relations Board ("NLBR"), against both UPS and the IBT. (Darden Dep. at Exs. 25, 26.)

11

consists of one union official and one management representative. (Brawley Dep., p. 57.) The

deadlock panel follows the same procedures as the committee. (Brawley Dep., p. 57.)

In the present case, prior to the meeting of the deadlock panel, Darden obtained a

notarized statement from Shannon Melton that was entered into evidence before the panel. [10]

(Brawley Dep., pp. 54-55, 61.) In her third statement, Melton wrote:

> To whom it may concern:
>
> On the evening of Wednesday, July 9,1997, I was approached by a
> supervisor telling me that he was pleased that I came forward to
> tell about the incident that took place between myself and Rashaun
> Dardin. I later was asked to come and fill out a statement against
> Rashaun for harassment. I did not report this incident to any UPS
> employee, they approached me telling me that I needed to fill out a
> report against the accused. This caught me off guard seeing that
> the incident was not as serious as it was made to be. I had planned
> to handle this situation on my own, but I was not able to seeing
> that I was asked to go in a separate direction from Shaun.
>
> I filled out a statement that Mr. Guy Sciro asked me, in which he
> continuously kept asking me did Rashaun sexually harass me. The
> answer that I continuously gave was no. Next, I was asked whether
> he had violently hurt me which again I said no. My initial
> statement, which was written on the 9th, clearly stated that
> Rashaun did not hurt me or sexually harass me in any way. Others
> that witnessed what actually happened between the two of us also
> did not say that Rashaun sexually or violently harassed. I was
> asked to fill out another statement a few days later on the 11th by
> Mr. Mike Boone, because he said that my first statement was not
> {illegible} his presence. He also kept asking me was I sexually
> harassed or violently attacked, which was no.
>
> Mr. Boone said that he wanted to have a picture in his head of
> exactly what happened which was his reason for asking me to
> make a so called clearer statement. I was in no way sexually
> harassed nor violently mistreated by Rashaun. I do not respect the
> fact that two statements had to be made and only one of the
> statements have been shown. Also, I did not like the fact of having

---

[10]Darden contacted Ms. Cohill, Melton's mother, who later discussed the incident with
Darden's mother; these mother-to-mother conversations ultimately led to Melton's efforts to reverse
UPS's discharge decision. (*See* Cohill Dep., pp. 8-10; Pl.'s Ex. 4 at pp. 30-32.)

12

> to be approached to have to fill out a statement when I could have
> handled the situation myself. I somewhat felt coerced to fill out a
> statement against Rashaun. <u>What I put in my statement(s) was</u>
> <u>what exactly happened</u>. Therefore, Rashaun should not have been
> fired on the grounds of sexual harassment nor violent or aggressive
> behavior because these actions were not found in my statements.
> Terminating Rashaun for these reasons would be going against my
> statements and placing false accusations on my part.
>
>                         ss Shannon L. Melton

Notarized - August 30, 1997

(Melton Dep. at Ex. 3) (emphasis supplied.) After considering this statement, along with the

other evidence, the deadlock panel upheld Darden's termination. (Darden Dep. at Ex. 29;

Darden Dep., pp. 240-41.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law. . . ." Fed. R. Civ. P. 56(c). The movant bears the initial burden of showing the court, by

reference to materials on file, that no genuine issues of material fact exist. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317 (1986); *Clark v. Coates & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).

After the moving party has discharged its burden, the non-movant must go beyond the pleadings

and designate specific facts showing there is a genuine issue for trial. *Jeffery v. Sarasota White*

*Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995). "Mere general allegations which do not reveal

detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust*

*Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover,

evidence that is merely colorable, *see Brown v. City of Lewiston*, 848 F.2d 1534, 1537 (11th Cir.

1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

## III. DISCUSSION

Darden did not rely on statistical or direct evidence of discrimination. Therefore, the Court will apply the *McDonnell-Douglas* burden shifting analysis to determine whether Darden presents evidence of discriminatory motive. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-5 (1973). Pursuant to the *McDonnell-Douglas* paradigm, the Court finds that Darden made out a prima facie case for discrimination because: (1) he is a member of a protected class, (2) he was qualified for his position, (3) he was discharged from his position, and (4) he was replaced by a non-minority. *See Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir. 1982).

## A.   UPS'S LEGITIMATE NON-DISCRIMINATORY REASONS FOR TERMINATING DARDEN.

UPS proffers several reasons for discharging Darden. (Boone Dep., pp. 49-50; Brawley Dep., p. 47.) First, UPS contends that it terminated Darden for violating verbal instructions to refrain from touching other employees. (Boone Dep., pp. 49-50; Brawley Dep., pp. 47, 51.) Second, UPS contends that the evidence available to it at the time of Darden's termination led UPS to reasonably conclude that Darden violated both Article 51 of the CBA and the workplace violence prevention policy. (*Id.*; Boone Dep., pp. 48-50.) These policies allow UPS to terminate employees for engaging in "unprovoked," "intimidating," "violent or threatening conduct . . . that could result in injury" or conduct that could be interpreted as "intent to do harm."

14

(Appendix A & B.)  As Boone testified, UPS did not "want to end up with some kind of postal office situation that might be brewing."  (Boone Dep., p. 83.)[11]

UPS points out that none of the evidence suggested that the victims had willingly participated in their encounters with Darden or encouraged him in any manner.  Rather, the witness statements indicated that Sandra Jones refused to date Darden, Sandra Sheppard refused to telephone Darden, and Melton told Darden to "stop" and to "leave her alone."  (Boone Dep. at Ex. 3, pp. 3-5,6.)  Further, Melton indicated that she had never flirted with Darden, "touched him nor gave[n] him the idea that [she] wanted him to touch [her] or try to flirt with [her]."  (Melton Dep. at Ex. 2.)  She also informed UPS in her written statements that Darden's conduct made her "angry," and "scared."  (*Id.*)

## B.    THE EVIDENCE UPON WHICH DARDEN RELIES DOES NOT DEMONSTRATE PRETEXT.

Darden argues that he can establish evidence of pretext because UPS's proffered non-discriminatory reasons for discharging him are implausible.  *See Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1564 (11th Cir. 1987) ("The implausibility of the alleged justification is sufficient to create a genuine issue of material fact as to whether [the employer's] articulated reason is pretextual.")  First, Darden claims that UPS was motivated by racial animus when it "rushed to judge" him guilty of violating the workplace violence policy.  In support of

---

[11]UPS aggressively enforces its workplace violence policy.  It has terminated employees who, unlike Darden, never verbalized threats or engaged in any physical contact with the accusor.  For example, UPS terminated Caucasian supervisor Hughey Green for cleaning his fingernails with a knife as he engaged in a conversation with another employee.  (Brawley Dep., pp. 69-70; Brawley Aff. at ¶ 6; Turner Dep., p. 36.)  Although Green never actually verbalized any threats, UPS interpreted Green's conduct as threatening and UPS terminated him for violating its workplace violence policy.  (Brawley Aff. at ¶ 6.)  Similarly, UPS terminated Robert Kilgore (Caucasian) for making disparaging statements to another employee in the context of comments about a recent shooting rampage.  (Brawley Dep., pp. 67-68; Boone Dep. at Ex. 8.)  Given the termination of Green and Kilgore, who did not verbalize threats or engage in physical contact, UPS argues that Darden's conduct, which included shoving, kicking and verbalized threats, certainly warranted termination.

15

this claim, Darden relies on evidence regarding the circumstances surrounding the investigation of his interactions with Melton and the circumstances surrounding his subsequent termination. Second, Darden claims that he did not commit workplace violence and he relies on statements by Shannon Melton to support his claim of innocence. Third, Darden argues that Brawley's response to Melton's third written statement, which Darden characterizes as a retraction, establishes evidence that Darden's termination was racially motivated. Fourth, Darden claims UPS ignored "horseplay" by other employees that was similar to his interactions with Melton. Finally, Darden argues that a police station incident relating to his employment at UPS establishes evidence of pretext. None of the evidence upon which Darden relies, considered singly or in combination, could lead a jury to conclude that UPS's legitimate non-discriminatory reasons for terminating him were pretextual.

### 1.  Darden Presents No Evidence To Support His Claim That UPS Was Motivated By Racial Animus And Therefore Rushed To Judge Him Guilty Of Violating Workplace Violence Policies.

Darden contends that UPS was motivated by racial animus when UPS purportedly jumped to the conclusion that he committed a terminable offense. As evidence of this alleged racially motivated "rush to judgment," Darden points out that UPS failed to provide him with union representation when it took him out of service, UPS took him out of service prior to investigating the charges, and UPS made the decision to terminate him prior to questioning him about the charges. (Pl.'s Br. at pp. 17 -19; Darden Dep. at Ex. 23.) As further evidence of the alleged rush to judgment, Darden claims that UPS coerced Melton during the course of its investigation. (*Id.*)

### a.   Darden was not entitled to union representation when UPS took him out of service.

Darden alleges that UPS's denial of his request for union representation on the evening

UPS took him out of service presents evidence of racial animus. (Darden Dep., p. 301.)

However, the uncontradicted evidence establishes that Darden was not entitled to union

representation when UPS took him out of service. (Boone Dep., pp. 75-77, 58; Brawley Dep.,

pp. 33-34; Turner Dep., pp. 22-23, 17.).  The CBA provides that an employee is entitled to union

representation or a union steward under two circumstances.  First, an employee is entitled to

union representation when the "employee reasonably contemplates disciplinary action." (Darden

Dep. at Ex. 34; *see* Darden Dep., pp. 262-64.)   However, putting an employee "out of service" is

a standard non-disciplinary method of handling and investigating "serious complaints" directed

at union employees. (Boone Dep., p. 58; Brawley Dep., pp. 33-34. When UPS takes an

employee out of service he simply "goes off the clock": (1) until he returns to work, with no loss

in pay, or (2) until UPS disciplines him in the presence of a union steward. (Turner Dep., p. 17;

Brawley Dep., pp. 33-34; Boone Dep., pp. 75-76, Brawley Aff. at ¶ 4.) Therefore, at the time

UPS takes an employee out of service and initiates an investigation, he does not know whether

UPS will ultimately exonerate or discipline him.  As such, he cannot "reasonably contemplate

disciplinary action" at that juncture.

The CBA also mandates union representation when "the Employer meets with the

employee concerning grievances or discipline or investigatory interviews." (Darden Dep. at Ex.

34.) However, when UPS puts an employee out of service it does not conduct a "meeting" or

"investigatory interview." (*See* Brawley Aff. at ¶ 4; Boone Dep., p. 59.) Instead, UPS tells the

employee to clock out. (*Id.* at pp. 75-76; Turner Dep., p. 17; Brawley Dep., pp. 33-34.) If UPS

ultimately decides to discipline the employee, UPS then arranges a meeting with the employee and his union steward, as required under the CBA. (*See* Brawley Aff. at ¶ 4.)

The IBT and the Alabama District of UPS have interpreted the steward representation provision of the CBA in this manner for over twenty-five years and UPS followed this interpretation when it took Darden out of service.[12]  (Brawley Aff. at ¶ 4; Brawley Dep., p. 33.) Specifically, UPS did not discipline Darden, conduct a "meeting," or initiate an "investigatory interview" with him on the night it took him out of service. (Brawley Aff. at ¶ 4; Darden Dep. at Ex. 3.)  Darden acknowledges that Jemison only told Darden to "clock out." (Darden Dep., pp. 82-83, 206-7,255; Darden Dep. at Ex. 3. )  Darden also acknowledges that he and Young did not discuss the potential workplace violence matter, but instead they discussed school while they waited for Darden's mother to arrive. (Darden Dep., pp. 407-408, 208, 303-305, 308.)  Not until UPS terminated Darden, in the presence of his union steward, did UPS discipline Darden or conduct a meeting with him. (Brawley Aff. at ¶ 4; Darden Dep., pp. 212-13, 419-23.)  Thus, UPS fully complied with the CBA's union representation requirements.

Consistent with UPS's position that Darden was not entitled to a union steward when it took him out of service, the grievance committee, which consists of both union and management representatives, determined that UPS did not violate Darden's rights under the CBA. (Darden Dep., p. 324.)  Similarly, the NLRB denied Darden's unfair labor practice claim over the matter.

---

[12]Where, such as here, the employer and the union operate over the years under a mutual interpretation of the CBA, such an interpretation evolves into a "past practice" which is enforceable as if the interpretation were clearly spelled out in the text of the CBA. *See e.g., Folger Coffee Co. v. International Union, U.A.W., Local 1805*, 905 F.2d 108, 110-111 (5th Cir. 1990) (noting that the "practices of the . . . shop" are "equally part of the collective bargaining agreement although not expressed in it" and recognizing the binding nature of past practice, even where it contradicts the language found in the CBA) (citations omitted); *Sullivan, Long & Hagerty, Inc. v. Local 559 Laborers' International Union of N.A.*, 980 F.2d 1424, 1428-1429, n.3 (11th Cir. 1993) (discussing the binding nature of past practice).

(Darden Dep. at Ex. 26.)  The NLRB determined that simply taking an employee out of service and later discharging that employee in the presence of a union steward does not implicate either Section 7 of the NLRA or the CBA with UPS.[13]  (*Id.*)

Inasmuch as Darden was not entitled to union representation, he cannot establish evidence of pretext by pointing to UPS's failure to summon a union steward when it took him out of service.  Darden also fails to establish pretext because he has no evidence that UPS applied the union representation provision of the CBA more favorably to Caucasian employees. Indeed, Darden admits that he is not aware of any non-African American employees for whom UPS summoned union stewards at the time UPS was taking the employee out of service. (Darden Dep., p. 207, 417.)  Consequently, Darden's pretext evidence relating to his union representation demand fails.

> **b.      UPS followed its standard procedures when it took Darden "out of service" and refrained from questioning him until his disciplinary meeting.**

Darden next complains that UPS took him out of service immediately upon receiving the complaint from Dion Jones and UPS did not question Darden until his termination meeting. This evidence does not indicate that UPS rushed to judge him.  Rather, Darden merely presents evidence that UPS followed its standard procedures for investigating and resolving allegations of serious misconduct involving union employees.  (*See* Turner Dep., pp. 22-23, 17.)  When UPS receives such an allegation, UPS first directs the accused to "clock out" (*i.e.*, leave work) pending investigation of the complaint.  (*See* Turner Dep., p. 17; Brawley Dep., pp. 33-34; Boone Dep., pp. 75-76; *see* Darden Dep., pp. 206-7.)  UPS does not initially discuss the details

---

[13]*See NLRB* v. *Weingarten, Inc.*, 420 U.S. 251, 267 (1975) (holding that an employee has a right, under Section 7 of the NLRA, to "union representation at investigatory interviews which the employee reasonably believes may result in a disciplinary action against him," even when this right is not explicitly found in the CBA.)

behind such a directive with the accused employee. (Boone Dep., p. 59; *see* Darden Dep., pp. 206-7.) However, if UPS ultimately decides that disciplinary action may be necessary, UPS holds a disciplinary meeting during which UPS questions the accused employee. (*See* Brawley Aff. at ¶ 4; Turner Dep., p. 22-23.)

Darden presents no evidence which suggests that UPS failed to adhere to these procedures when it investigated the allegation that he had pushed Melton. Under the Workplace Violence Prevention Policy, UPS has a duty to treat all reports of alleged violence as "important" and undertake an investigation. (Boone Dep. at Ex. 5; Boone Dep., p. 71, 91; Brawley Dep. pp 31-32, 60; Turner Dep., p. 17; Appendix B.) Therefore, once UPS learned that Darden may have pushed another employee, it immediately took him out of service and began its investigation. After UPS concluded the investigation and made its decision regarding discipline, UPS held a meeting with Darden and his union representative. (Boone Dep., pp. 77-79.) At that meeting, Darden had an opportunity to present his version of the events involving Melton. (*Id.* at pp. 86-88.) While Darden finds fault with this course of events, he presents no evidence that UPS deviated from its routine procedures when it took him out of service and waited until his disciplinary meeting to question him about the allegations.

Not only did UPS follow its usual procedures when it took Darden out of service, but UPS followed these same procedures when it investigated similar accusations involving another union employee: Jon Reid, who is Caucasian. In May of 1997, just a few months prior to Darden's termination, UPS received a complaint from a customer that Reid had touched her leg. (Boone Dep., p. 103-6; Boone Dep. at Ex. 8; Brawley Aff. at Ex. 1; *see* Brawley Dep., pp. 66-67.) In response, UPS put Reid out of service for potential violation of the unprovoked violence policy. (Brawley Aff. at Ex. 1.) When Reid made "several [unsuccessful] attempts to get information on what the complaint was [about], [UPS] instructed [Reid] to leave the premises."

(*Id.*) After interviewing the customer who made the complaint, along with witnesses to Reid's conduct, UPS terminated Reid for violating the unprovoked physical violence policy and the sexual harassment policy.[14]  (Brawley Aff. at ¶ 5; Boone Dep., pp. 104-6; Brawley Dep., pp. 66-67).

Given the similarity between the complaints lodged against Reid and Darden, along with the identical response by UPS to the complaints, Darden cannot establish that UPS treated him less favorably than similarly situated non-African American employees.  Accordingly, Darden fails to establish evidence of pretext as it relates to the procedures UPS followed when it took him out of service and later discharged him. [15]

### c.   Darden has no evidence to substantiate his claim that UPS coerced Melton during its investigation.

Darden argues that the "coercive" "manner in which [Melton's first two witness statements] were obtained" prevents UPS from relying on these statements in support of its legitimate non-discriminatory reasons for discharging him.  (Pl.'s Br. at p. 18.)  According to Darden, UPS coerced Melton by questioning her on two occasions, obtaining two witness statements and purportedly attempting to convince Melton to lie about Darden's conduct.  However, Darden provides no evidence to support his claims.  Darden argues that interviewing a potential victim of workplace violence and/or sexual harassment on two occasions in a manner that she perceived as coercive presents evidence that UPS acted with discriminatory motive.

---

[14]Although UPS defended the termination decision, Reid ultimately was reinstated through the collective bargaining grievance process.  (Boone Dep., pp. 104-5; Brawley Dep., pp. 66-67; Boone Dep. at Ex. 8; Brawley Aff. at Ex. 1.)

[15]Darden also claims that while UPS was taking him out of service, a UPS supervisor told Darden's mother that she should obtain a "mouth piece" for Darden because UPS was attempting to "burn" him. (Johnson Dep. 13; Pl.'s Br. at p. 4.)  Assuming for purposes of summary judgment that a UPS supervisor did make this comment, it does not present evidence of pretext.  There is nothing about the comment which indicates that Darden's termination was tainted by discriminatory animus.

21

Darden cannot rely on Melton's perceptions to establish evidence of pretext. *See Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) (noting that plaintiff cannot survive summary judgment by relying on "conclusory allegations without specific supporting facts" regarding alleged disparate treatment).

While Melton declared in her third witness statement that she "somewhat felt coerced to fill out a statement against" Darden, Melton explained during her deposition that she used the word "coerce" because: (1) she had not reported the incidents to UPS, (2) she had not been sexually harassed, (3) she was asked to prepare a second statement, and (4) she was "annoyed" by the entire matter. (Melton Dep., pp. 16, 20-22, 38-40, 37.) Melton's annoyance does not establish that UPS coerced her or influenced her to prepare a statement against her will. Indeed, Melton's own deposition testimony demonstrates that UPS did not coerce her. Melton testified that UPS assured her that she could relax and reveal any misconduct which may have occurred. (Melton Dep., pp. 17, 19-21.) UPS also offered to allow Melton to talk privately with a female employee, in the event Melton felt uncomfortable about talking in the presence of a male. (Melton Dep., p. 20.) When asked during her deposition if she "ever [told UPS] that [she] didn't want to write or prepare a statement, Melton responded, "No. They just asked me to write what happened." (Melton Dep., p. 24, 39.) There is no evidence of coercion where, as here, an employer asks an employee to prepare a written statement and she makes no objection to doing so.

Similarly, UPS's questioning of Melton on more than one occasion does not establish evidence of coercion. As UPS points out, once it became aware of potential workplace violence, it had an obligation to obtain all relevant information and take appropriate action to ensure that any misconduct did not continue. (*See* Boone Dep., p. 98, 94-97.) To that end, Boone, who had been out of town when UPS initially investigated the matter, questioned Melton the second time

to ensure that UPS was doing the "right thing" before making a decision about Darden. (*Id.* at pp. 94-97.) Boone also questioned Melton because Brawley had raised some questions about whether Melton had engaged in any physical contact with Darden. (*Id.* at pp. 94-96.) As a result of the meeting between Boone and Melton, the second statement revealed significant additional details about Melton's encounters with Darden. In her second statement, Melton noted that Darden pushed her hard enough that he caused her to drop her clipboard. (Melton Dep. at Ex. 2; Boone Dep., p. 81) Melton's second statement also noted that she had not touched Darden or given him any reason to think she "wanted him to touch [her] or try to flirt with [her]."[16] (Melton Dep. at Ex. 2; Brawley Dep., p. 52.) Thus, Melton's second statement satisfied Brawley's concerns about whether Melton "invited" or "incited" the encounters.

While Melton now says that she concluded Boone wanted her to say something that was untrue, Melton's own deposition testimony supports a contrary conclusion. Melton testified that no one attempted to dictate what she wrote, (Melton Dep., p. 49), and she never fabricated any of the events she reported in her witness statements. (Melton Dep., pp. 9-11,25-26.) Instead, Melton relies solely on Boone's "tone and the questions" he asked as evidence that he wanted her to misrepresent the truth. (Melton Dep., pp. 46-47) According to Melton, Boone asked her several times if she had been sexually harassed and he asked her to give him a "clearer picture" of what had occurred, by requesting that she describe her encounters with Darden in more "graphic" detail than she had in her first statement. (Melton Dep., pp. 46, 37-38.)

There is nothing unusual or suspect about this course of events. Boone testified that he had a duty, as center manager, to confirm that Melton was not reluctant to reveal potential sexual

---

[16]Darden testified in his deposition that he did not recall Melton touching or flirting with him. (Darden Dep., pp. 151, 372.)

harassment out of fear or embarrassment.[17]  (Boone Aff. at ¶ 5.)  While Boone does not recall

using the term "graphic," even if he did use this term there is no evidence that he was attempting

to coax Melton into lying about Darden.  Boone testified that he was attempting to convince

Melton to "paint a picture" and tell him "exactly" what had occurred, as he does whenever he

investigates complaints involving non-management employees who may not understand the

importance of describing events in precise detail.  (Boone Aff. at ¶ 5; Boone Dep., pp. 64-66.)

Indeed, Melton admitted that she believed Boone was motivated by the desire to convince her to

speak openly about whether or not she had been sexually harassed.  (Melton Dep., pp. 37-38.)

None of these circumstances provide evidence from which a jury might conclude that UPS

coerced Melton or proceeded with racial bias when it investigated Darden's conduct.

### 2.   Darden Cannot Avoid Summary Judgment by Claiming He Did Not Commit Workplace Violence or Relying on Melton's Testimony That UPS Should Not Have Fired Darden Because He Purportedly Committed No Violent Acts.

Although Darden admitted in one of his serial grievance reports that he pushed Melton,

(Darden Dep. at Ex. 13), he argues that such conduct does not violate UPS workplace violence

policies.  (*See* Darden Dep., p. 295, 257.)  However, Darden cannot establish pretext merely by

asserting that he did nothing wrong.  Darden's opinions about whether his conduct actually

constituted a violation of UPS policies is not the focus of the pretext analysis.  Rather, the

pretext analysis focuses upon whether UPS acted reasonably and without discriminatory motive

when it took the challenged employment action. *See e.g., Elrod v. Sears, Roebuck and* Co., 939

F.2d 1466,1470 (11th Cir. 1991) ("If the employer fired an employee because it honestly

believed that the employee had violated a company policy, even if it was mistaken in such belief,

---

[17]When the Darden incident occurred Melton was not yet twenty-one years old. (*See* Melton Dep., pp. 7-8.)  Although Boone did not know Melton's precise age, he knew that she was very young. (Boone Aff. at ¶ 5.)

the discharge is not 'because of race' and the employer has not violated ..." the law.)   Darden presents no evidence that UPS acted unreasonably or that its legitimate non-discriminatory reasons for his termination are suspect.  Indeed, even if the witnesses had lied about Darden's conduct, he could not survive summary judgment unless he could establish that UPS acted unreasonably or with discriminatory motive when it credited the witnesses' statements.  (*See id.*) (noting that whether or not the employee committed the infraction "is irrelevant to the question [of] whether the employer believed the employee had done wrong") (citation omitted).  Darden presents no evidence that UPS acted unreasonably or with discriminatory motive when it credited the witnesses' statements.  (*See id.*)  (noting that whether or not the employee committed the infraction "is irrelevant to the question [of] whether the employer believed the employee had done wrong") (citation omitted).  Darden presents no evidence that UPS acted unreasonably or with discriminatory motive when it credited the statements of its employees concerning Darden's conduct.

Darden argues that Melton's deposition testimony presents evidence that creates a disputed issue of fact surrounding the legitimate non-discriminatory reasons for his discharge. (Pl.'s Br. at p. 17.)  Specifically, Darden points out that UPS admittedly takes into consideration the alleged victim's state of mind when it determines whether the accused employee has violated workplace violence policies.  (Pl.'s Br. at p. 18.)  Darden further points out that Melton was not the person who initially reported her interactions with him to UPS and she testified, during her deposition, that Darden's conduct toward her was not violent and she believed that "he should not [have been] fired for anything that pertained to [her] at all."  (Pl.'s Br. at pp. 17-18; *see* Melton Dep., p. 48.)  Melton also testified that she did not consider Darden's conduct "serious." (*Id.* at pp. 44-45.)  Because UPS determined that Darden violated workplace violence policies, despite this evidence about Melton's state of mind, Darden argues that a jury could conclude that

UPS's non-discriminatory reasons for terminating him were pretext for unlawful race discrimination. (*See* Pl.'s Br. at pp. 18-19.)

The court is unpersuaded by Darden's argument. As an initial matter, Melton's failure to report Darden's conduct did not necessarily suggest to UPS that she did not consider his behavior serious at the time it occurred. Indeed, Melton indicated in her second written statement that she was "scared" of Darden because she "did not know what he was capable of doing." (Melton Dep. at Ex. 2.) Accordingly, Melton's initial silence does not lead to the inference that she did not consider the matter "serious." Moreover, the evidence indicates that UPS investigates all reports of potential workplace violence, whether UPS receives the report from the alleged victim or a third party. (Boone Dep., pp. 71, 91; Brawley Dep., pp. 31-32, 60.)

Similarly unavailing is Darden's argument that Melton's deposition testimony, regarding her perceptions of Darden's conduct, establishes pretext as it relates to UPS's non-discriminatory reasons for discharging him. There is no evidence that Melton gave UPS any indication, at the time of the investigation, that she was unafraid of Darden or that she did not consider the matter "serious" enough to investigate. (Boone Dep., 93; Brawley Dep., pp. 48, 88-98, Sciro Aff. at ¶ 5; Brawley Aff. at ¶ 10; Boone Aff. at ¶ 5; *see* Melton Dep., pp. 32-34, 44-45.) Indeed, at the time UPS investigated the Darden incident, Brawley observed that Melton appeared frightened of Darden, (Brawley Aff. at ¶ 10), and Melton confirmed Brawley's observation by communicating in her first two handwritten statements that Darden's conduct made her "angry," "uncomfortable" and "scared." (Melton Dep. at Exs. 1, 2.) Even in her so-called retraction statement (i.e., the third statement), Melton specifically affirmed that "[w]hat I put in my [first two] statement(s) was what exactly happened." (Melton Dep. at Ex. 3.) That Melton currently describes scared as being caught "off guard" and "startled," rather than afraid for her safety,

26

(Melton Dep. pp. 22, 31-32, 34, 36, 40, 45), does not create evidence that UPS acted unreasonably at the time it discharged Darden. (Brawley Dep. p. 60.)

Moreover, as UPS points out, even if Melton had informed UPS at the time of the investigation that she did not fear Darden or that she did not consider his conduct serious, under its well-publicized policy UPS states it could not have ignored Darden's behavior. While UPS admittedly takes into consideration the victim's state of mind, neither UPS or the plaintiff proffered evidence that such information is determinative when investigating allegations of workplace violence. UPS workplace violence policies specifically prohibit "threatening" or "intimidating" behavior, as well as "unprovoked" "violent" conduct "that could result in injury" to another employee. (Appendix A & B.) As UPS points out, it cannot sanction such conduct by failing to take remedial action, even if the victim is not inclined to pursue the claim. Notwithstanding Melton's current statements about Darden's conduct, she never retracted her first two written statements which establish that Darden shoved her and threatened to push her again, that Darden's conduct was unwelcome and that she did not initiate or provoke their encounters. UPS reasonably determined that such conduct violated its workplace violence policies and Darden cannot escape summary judgment by pointing to Melton's failure to report him or her present state of mind as evidence of pretext.

### 3.   Brawley's Response to Melton's Third Witness Statement Does Not Establish Evidence of Pretext.

Darden next argues that he can demonstrate pretext because of the manner in which Brawley interpreted Melton's third witness statement. Specifically, Brawley believed that Darden and his mother had possibly intimidated Melton into preparing the third witnesses statement, in which Melton stated that Darden's conduct was "not as serious as [UPS] made [it] to be," and that Darden "should not have been fired on the grounds of sexual harassment nor

violent or aggressive behavior." (Brawley Dep. pp. 61-62, 86-89; Melton Dep. at Ex. 3.)  Indeed,

the handwritten notes Brawley prepared when he initially received a copy of the third statement

from Darden's union representatives, reflect Brawley's opinion that Melton's third statement

was "no more than mere intimidation from Rahsaan."  (Brawley Dep. p. 85-86.)  Because

"Brawley did not consider the possibility that Melton felt coerced into making the first two

statements, as she said explicitly in the third statement," Darden argues that a jury could

determine Brawley was motivated by discriminatory intent when he defended the termination at

the grievance level.  (Pl.'s Br. at p. 8)

Darden presents no evidence that Brawley's facially-reasonable interpretation of the third

statement was infected by discriminatory intent.  According to Brawley, Melton appeared afraid

when he questioned her about Darden, and she did not mention anything during the investigation

which might indicate that terminating Darden would be inconsistent with her witness statements.

(Brawley Dep., p. 60-63, 88; Brawley Aff. at ¶ 10; *see* Melton Dep., at Ex. 3.)  Brawley further

testified that he did not consider whether or not Melton might have been coerced when she wrote

the first two statements because he "talked to her at the very get-go and she pretty much told

[Brawley] some of the information that's in both of these [first two statements] freely."

(Brawley Dep., p. 62; *see id.* at p. 89.)  Consequently, Brawley had no reason to question

whether Melton had prepared the first two witness statements under coercion.  In contrast,

Brawley had no knowledge regarding the circumstances under which Darden, or his mother, had

obtained the third statement, which contained exculpatory sentiments that appeared inconsistent

with the first two statements.  (*See* Brawley Dep., pp. 61-62, 86-89.)  As such, Brawley

suspected that someone had coerced Melton into preparing the third statement.  While Darden

challenges the wisdom of Brawley's response to this statement, Darden presents no evidence that

Brawley responded with discriminatory animus when the third statement surfaced months after

28

UPS concluded its investigation into the matter. *See Smith v. Alabama Dept. of Pub. Safety*, 64 F. Supp. 2d 1215, 1228 (M.D. Ala. 1999) ("[T]he court's responsibility is not to second guess the wisdom of defendant's reasoning, but to determine if the reasons given were merely a cover for discriminatory intent.").

### 4. Darden Cannot Establish Pretext By Relying On Evidence Regarding UPS's Response To Conduct That Was Not Nearly Identical To Darden's Conduct.

Darden claims that UPS treated others more favorably than him when UPS refrained from disciplining employees who engaged in what Darden describes as "violence" on the one hand, (Darden Dep., pp. 18-19), or "tussling" and "horseplay." (Darden Dep., pp. 24, 30, 347-48, 352-53.) Specifically, Darden claims that he witnessed Boone and other employees "bump chests," "wrestle" "tussle" and give each other "high fives," often in the context of discussions about football. (Darden pp., 336-39, 18-33.) Because UPS did not terminate these individuals for violating workplace violence policies, Darden argues that UPS engaged in disparate treatment. (Darden Dep., pp. 255-56.)

Darden testified that both Caucasian and African-American employees engaged in "horseplay." (Darden Dep., pp. 338, 353, 19-21, 24-25, 40-41.) Thus, Darden has no evidence of disparate treatment. Second, Brawley, the ultimate decision maker in the present case, (Brawley Dep., p. 46; Turner Dep., pp. 29-30; Boone Dep., p. 77), was unaware of the alleged horseplay.[18] (Brawley Aff. at ¶ 7.) Darden never reported the conduct to management.[19] Brawley could not have acted with discriminatory motive by failing to discipline employees for conduct about which he was unaware.

---

[18]To the extent supervisors (*i.e.*, non-Teamsters) were involved in the alleged horseplay, even if Brawley had been aware of such conduct he had no power to administer discipline. (Brawley Aff. at ¶ 7.)

[19]Darden testified that he only "reported" the horseplay to his friend Hurdle Samules, (Darden Dep., pp. 340, 28-30, 33-34), who is not a supervisor. (Reese Aff. at ¶ 2).

29

Even if Brawley had been aware of the horseplay, his inaction does not establish disparate treatment because the conduct Darden describes does not present appropriate comparator evidence. Comparators must be similar to the plaintiff "in all material respects." *Shumway v. UPS,* 118 F.3d 60, 64 (2nd Cir. 1997) (citations omitted). To satisfy this standard, the Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges ....." *See Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citations omitted and emphasis supplied).

None of the evidence proffered by Darden establishes that UPS ignored misconduct by Caucasian employees that was "nearly identical" to Darden's. The witness statements from Melton, Sheppard and Sandra Jones indicate that Darden's conduct was threatening, intimidating, non-consensual and unprovoked. (*See* Boone Dep. at Ex. 3; *see* Melton Dep. at Exs. 1 & 2.) In contrast, Darden knew nothing about whether the participants in the horseplay he allegedly witnessed exchanged angry words, if they were upset, or whether they got hurt. (Darden Dep., pp. 25-27, 31.) In other words, Darden presented no evidence that the horseplay he allegedly observed was "threatening," "intimidating," non-consensual or "unprovoked." (*See* Appendix A & B.) *See Bluebeard's Castle Hotel v. Government of the Virgin Islands, Dept. of Labor,* 786 F.2d 168, 172 (3d Cir. 1986) ("This paucity of evidence provid[ed] insufficient detail and insufficient basis upon which to measure the similarity between the . . . incidents involving [Plaintiff] and [the comparator].") Accordingly, Darden cannot meet the "nearly identical" standard.

While Boone stated in his deposition that UPS "would not allow people to be wrestling at all," UPS points out that the workplace violence policy is not necessarily implicated even if such conduct did in fact occur. (Boone Dep., pp. 100, 98-99; *accord* Brawley Dep., pp. 72, 74-75.)

Contrary to the assertion made in Darden's brief, no UPS official testified that horseplay, or exuberance *does* constitute a violation of the workplace violence policies. (*See* Pl.'s Br. at pp. 9, 21.) Rather, Brawley testified that such conduct "*can*" constitute workplace violence, but UPS looks at the circumstances surrounding the conduct before concluding whether such polices are implicated. (Brawley Dep., pp. 72, 74-75; *accord* Boone Dep., pp. 98-99.) Thus, expressions of exuberance in which the parties willingly participate do not constitute "unprovoked violence," "threatening comments" and/or "intimidation." (Brawley Aff. at ¶ 7; *see* Brawley Dep., pp. 72,74-75; Boone Dep., pp. 98-100.) A reasonable jury could not equate unauthorized and unwelcome pushing and kicking, racially derogatory language and threats (*i.e.*, the conduct in which Darden engaged) with willing expressions of enthusiasm and comradery that employees manifest in the form of bumping chests, tussling and giving each other high fives. Therefore, assuming for purposes of defendant's Motion for Summary Judgment that Boone and others did engage in horseplay as Darden alleges,[20] such conduct was not "nearly identical" to Darden's, nor of the same "quality" as Darden's and UPS was justified in refraining from terminating Boone and others. "[I]f an employer applies a rule differently to people it believes are differently situated, discriminatory intent has not been shown." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984).

### 5.   Darden's Visit To The Police Station Does Not Establish Evidence of Pretext.

Darden argues that supervisor Michael Holmes (Caucasian), (Darden Dep., pp. 43-44), acted in a discriminatory manner when he told Darden to visit a local police station after UPS experienced thefts associated with high value packages for which Darden had been responsible.[21]

---

[20]Boone declares that he did not engage in, nor was he aware that others engaged in "tussling," "body slamming" "wrestling" or similar types of horseplay. (Boone Aff. at ¶ 7. )

[21]UPS paid Darden for the time during which he visited the police station. (Darden Dep., p. 363.) Additionally, when Darden arrived at the station the detective with whom he was to

(Darden Dep. at Ex. 10; Darden Dep., p. 266, 359-65, 124-36; *see* Boone Dep., pp. 42-46.)
Specifically, Darden asserts that "no other employees, including the white high value clerks or
drivers involved with the [missing] high value packages, were referred to the police." (Pl.'s Br.
at pp. 2 n. 2, 21.) In support of this assertion, Darden relies on the testimony of his mother,
Virgie Johnson, who merely questioned whether or not Darden was the sole UPS employee who
visited the police station in connection with the missing high value packages. (*See* Pl.'s Ex. 4,
Johnson Dep., pp. 43 - 47.) Indeed, Ms. Johnson testified that she knew "very little" about the
police station incident," but, *if* Darden was the only person whom the police questioned, then she
believed race to be the motivating factor behind the incident. (*See id.* at pp. 43, 45.) Therefore,
Ms. Johnson asked Boone "was anybody else sent to the police station besides Rahsaan." (*Id.* at
45.) According to Johnson, Boone replied that he did not know Darden had been sent to the
police station. (*Id.* at 45-46.) Such testimony does not establish that Darden was the only person
who visited the police station or that UPS, rather than the police, selected Darden for
questioning. Without evidence from someone who actually knows who the police questioned, or
who selected Darden for questioning, Darden fails to satisfy his obligations under Rule 56,
which requires that he produce evidence based upon "personal knowledge." *See* Fed.R.Civ. P.
56(e). Darden cannot survive summary judgment by relying on his mother's conclusory
assertions. *See e.g.*, *Smith,* 64 F.Supp.2d at 1234 ("[C]onclusory allegations, speculation, and
unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.") (citation omitted).

## IV. CONCLUSION

Darden complains of race discrimination. Here, an African-American hourly employee
prompted UPS's investigation by reporting Darden's misconduct to an African-American

---

scheduled to speak was not at the station. (Darden Dep., p. 363.) Darden left the police station and
never returned. (Darden Dep., p. 363.)

supervisory employee. All the "victims" and all the witnesses were African-American. (Boone Aff. at ¶ 4.) While the decision maker was not African-American, the evidence supports the reasonableness of the decision maker's response. Darden has not presented sufficient evidence from which a jury might conclude that UPS discharged him because of his race. Consequently, UPS is entitled to summary judgment on Darden's claims.

A separate order granting summary judgment will be entered contemporaneously with the present opinion.

DONE this **29th** day of September, 2000.

**SHARON LOVELACE BLACKBURN**
United States District Judge

33

PLAINTIFF'S
EXHIBIT

attorneys to present their cases to the arbitrator at the time of selection of the arbitrator. The decision to use attorneys will be at the sole discretion of the Local Union. The cost of the Arbitration shall be shared equally by the parties. The decision of the arbitrator shall be final and binding on the parties and employees involved. In the even that the losing party fails to abide by the arbitrator's decision, or that either party refuses to submit to the arbitrator's jurisdiction, the other party shall have the right to take all legal or economic recourse.

## ARTICLE 51. DISCHARGE OR SUSPENSION

(A) The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one warning notice of a complaint against such employee to the employee, in writing, and a copy of the same to the Local Union, except that no warning notice need be given to an employee before discharge if the cause of such discharge is dishonesty, drinking of or under the influence of alcoholic beverage or narcotics, including hallucinogens while on duty, carrying or permitting the carrying of drugs or narcotics on his/her person, or equipment, that is prohibited by State or Federal Law (including meal period), recklessness resulting in a serious accident while on duty, an avoidable runaway accident, failure to report an accident, carrying of unauthorized passengers while on the job, or engaging in unprovoked physical violence on Company property or while on duty.

(B) Sobriety - Drug Test: The refusal to take a drug and/or alcohol test where there is reasonable cause to believe an employee is under the influence of either illegal drugs and/or alcohol may result in disciplinary action up to and including discharge.

The warning notice as herein provided shall be given to the employee with a copy to the Union within ten (10) working days of said complaint or within ten (10) working days of knowledge of said complaint and shall not remain in effect for a period of more than nine (9) months from date of said warning notice.

Discharge or suspension must be by proper written notice to the employee and Union affected. Any employee may request an investigation as to said discharge or suspension. Should such investigation prove that an injustice has been done an employee, the

- 129 -

D0101

PLAINTIFF'S
EXHIBIT

UPS Committed . . .

P E R M A N E N T   P O S T I N G

## WE STRESS SAFETY THROUGHOUT OUR COMPANY.

The safety of our people and of the general public is of utmost importance to us. We train our people to avoid injury to themselves and others in all phases of their work. We do not tolerate unsafe work practices.

We encourage participation by all of our people in safety awareness activities and give recognition to employees for specified safety accomplishments. We are all committed to fostering the most effective safe practices in all our work.

By meeting our own high safety standards, we will be contributing to the well-bein~ of our people, our company, and the communities we serve.

## ALCOHOL, ILLEGAL DRUGS AND FIREARMS

In order to help ensure a safe workplace for all UPS employees and the general public, UPS maintains a strict position regarding firearms, alcohol and illegal controlled substances.

The purpose of this permanent memo is to ensure that all employees understand the company's position.

All UPS employees are prohibited from using or possessing a firearm, or using, possessing or being under the influence of alcohol or illegal controlled substances while on UPS property or while conducting official UPS business. This includes, but is not limited to UPS vehicles, UPS facilities, including parking lots, customer premises, and while on duty or during personal breaks.

Any employee discovered to be in violation of the above will be subject to disciplinary action up to and including discharge.

## WORKPLACE VIOLENCE PREVENTION POLICY

UPS is committed to a safe working environment, free of threats, intimidation and physical harm. All employees have a right to work in a safe environment and share the responsibility for assuring each other's safety. UPS has a policy of zero tolerance.

UPS prohibits physical assaults (fights), threatening comments, intimidation, and the intentional destruction of any company property, employee's property, or merchandise. Any comments or behavior that reasonably could be interpreted as an intent to do harm to employees or property will be considered a threat.

Any employee who believes he or she may be the target of violence or threats of violence or is aware of violent or threatening conduct by another individual that could result in injury to a UPS employee or the destruction of property, has a responsibility to immediately report the situation to his / her immediate supervisor or manager. If the employee is unable or prefers not to contact the immediate supervisor / manager, the employee can promptly contact one of the four management representatives listed below or call the UPS Business Conduct Line at 1-800-220-4126 — 24 hours a day.

Your information will be treated as important and appropriate action, including an investigation, will be taken. If an investigation reveals that this policy has been violated, such conduct will be dealt with through disciplinary action which may include, but is not limited to, suspension or termination of employment of persons in violation of this policy. Individuals violating laws also may be subject to criminal prosecution.

UPS understands the sensitivity of the information requested and will make every effort to maintain confidentiality.

Contact:

| | |
|---|---|
| Human Resources Manager | Labor Relations Manager |
| Occupational Health Representative | Security Manager |

D0097

**Appendix B**